```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JARRETT FROST,                                                :
                        Plaintiff,                            :
v.                                                            :
                                                              :      **OPINION AND ORDER**
SERGEANT ALEXANDER DAVIS,                                     :
CORRECTION OFFICER ("C.O.") JOHN                              :      17 CV 8418 (VB)
SCHILIRO, C.O. CHRISTIAN TANNUM,                              :
C.O. HERMAN DAWSON, and C.O. LOUIS                            :
MELENDEZ,                                                     :
                        Defendants.                           :
--------------------------------------------------------------x
```

Briccetti, J.:

Plaintiff Jarrett Frost, proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983 against defendants Sergeant Alexander Davis, Correction Officer ("C.O.") John Schiliro, C.O. Christian Tannum, C.O. Herman Dawson, and C.O. Louis Melendez. Plaintiff claims defendants subjected him to excessive force and turned off the water in his cell at Westchester County Jail ("WCJ"), in violation of his Fourteenth Amendment rights.

Now pending is defendants' motion for summary judgment. (Doc. #43).

For the reasons set forth below, the motion is GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted memoranda of law, statements of material facts pursuant to Local Civil Rule 56.1, declarations, and supporting exhibits. Together, they reflect the following factual background.

Plaintiff was a pretrial detainee housed at WCJ at all relevant times.

On July 31, 2017, a non-party correction officer saw damage to plaintiff's cell suggesting plaintiff had tried to escape. Plaintiff received a disciplinary report for attempted escape—an

1

infraction sufficiently serious to justify under Westchester County Department of Correction ("DOC") policy plaintiff's transfer from his housing block to WCJ's Special Housing Unit ("SHU").

WCJ's Emergency Response Team ("ERT"), including all five defendants, was summoned to transfer plaintiff from his cell to the SHU. As required by DOC policy, an officer trailed the responding ERT officers and continuously recorded video and audio of their interaction with plaintiff, starting when defendants left their staging area and continuing until the transfer of plaintiff into the SHU was complete.

An electronic copy of the video is in the summary judgment record. (Doc. #47 ("Chen Decl.") Ex. 6). For purposes of deciding the instant motion, the Court summarizes below the portions of it material to plaintiff's claims.

The video shows defendants walking into plaintiff's cell, placing handcuffs on plaintiff's wrists and ankles, removing plaintiff from his cell, and escorting plaintiff to a medical area. WCJ medical staff then examine plaintiff and medically clear him to be transferred to the SHU. After receiving medical clearance, defendants escort plaintiff from the medical area to the SHU. En route, plaintiff says his "restraints are kind of tight."[1] Approximately three minutes later, defendants escort plaintiff into his new cell in the SHU. Less than four minutes after plaintiff's remark about his restraints, an officer removes them.

DOC policy requires all inmates transferred to the SHU to be strip searched before being left in their new cells. Accordingly, after removing plaintiff's restraints, an officer directs plaintiff to take off his clothing so he could be strip searched. The officer states, "If you refuse

---

[1] This statement is not audible on the video. However, the parties agree plaintiff made this remark. (Doc. #44 ¶ 14; Doc #51 ¶¶ 14, 118).

to comply with orders, physical force, chemicals, or contact weapons can be used against you 'til you do." (Vid. I at 12:12).[2] Plaintiff refuses to comply for approximately fifteen minutes, mainly protesting that he does not want to be strip searched on camera, purportedly for religious and other reasons.[3]

In response to plaintiff's protests, a DOC captain enters plaintiff's cell, asks plaintiff why he refuses to take off his clothes, and explains to plaintiff he must be strip searched pursuant to DOC and WCJ policy and that the encounter was being filmed for plaintiff's and the officers' protection. Among other things, the captain tells plaintiff, "If you fail to comply, we're going to have to forcibly cut your clothing off you. And that's gonna also be on video. It's not something we want to do. . . . It's the same thing we usually—we always do. And again, it's not to demean you at all." (Vid. I at 14:30). The captain then asks plaintiff if he will comply with the strip search; plaintiff says, in substance, that he does not want to be strip searched on camera. The captain tells plaintiff, "We're trying to be reasonable with you, but at the end of the day, this has to be done." (Vid. I at 15:18). Plaintiff again refuses to comply. An officer in plaintiff's cell says, "You are a grown man. We don't wanna cut your clothes off. . . . You're a grown man, just take your own clothing off." (Vid. I at 15:57). Plaintiff's amended complaint alleges a defendant at one point told plaintiff, "Have some Decency for yourself, or no respect for you." (Doc. #11 ("Am. Compl.") at 3).[4]

---

[2] The video comprises two files. The second file begins immediately after the first file ends. Citations to "Vid. I at ___" and "Vid. II at ___" refer to the first and second videos, respectively.

[3] Plaintiff identifies as Jewish. At his deposition, he testified he knows of no aspect of the Jewish religion that prohibits being strip searched on camera.

[4] Citations to the amended complaint reference page numbers automatically assigned by the Court's Electronic Case Filing system.

Plaintiff continues to refuse to comply with the strip search, and defendants summon a mental health worker who arrives at plaintiff's cell approximately twenty-three minutes into the video. The mental health worker spends approximately five minutes explaining to plaintiff the purpose of the strip search and the camera. Plaintiff continues to refuse to take off his clothing and comply with the strip search.

Approximately twenty-eight minutes into the video, plaintiff having continued refusing voluntarily to participate in the strip search, an officer directs the other officers to remove plaintiff's clothing forcibly. Plaintiff falls to his knees despite having been ordered to remain standing and place his knee up on a bench immediately in front of him. Defendants forcibly pull plaintiff up from his knees to his feet. Plaintiff starts screaming and tries to kneel on the ground again. An officer says, "Don't try to sit back down, or else force will be used again." (Vid. I at 28:54). Officers then move plaintiff onto a concrete bed in the cell.

Plaintiff, still clothed, ends up face-down on the bed and is restrained in that position by several officers. Plaintiff continues physically to resist and screams and curses at the officers. The video does not show any officer striking plaintiff. Rather, the officers restrain plaintiff on the bed using their arms, hands, and body weight, and later with mechanical restraints.

Approximately thirty minutes into the video, plaintiff remains face-down on the bed and physically restrained by officers. As officers prepare to cut off plaintiff's clothes using a pair of scissors, plaintiff repeatedly yells "He just smacked my face!" and "He just put his finger in my ass!" (Vid. I at 30:00). Plaintiff's buttocks are briefly obstructed at this moment of the video by officers' bodies. The camera then re-positions and shows plaintiff on the bed fully clothed. At his deposition, plaintiff testified, "at this time during the procedure of the individual cutting my clothes off I felt one of the officers possibly to my right or left swipe through my anus area

4

possibly checking for any types of contraband or something." (Chen Decl. Ex. 1 at 8). According to plaintiff, this "swipe" lasted "[a] quick second, [or] two." (Id. at 9).

Less than one minute later, an officer says other officers will cut off plaintiff's clothing and directs plaintiff to comply. Plaintiff says "No" and accuses the officers of violating him. (Vid. I at 30:58). Officers begin cutting off plaintiff's clothes. Plaintiff physically resists and once again starts screaming and cursing. After cutting off and removing plaintiff's pants, an officer says, "Underwear coming off." (Vid. I at 31:22). Officers then remove plaintiff's boxer shorts and begin cutting off plaintiff's shirt. Plaintiff yells that the officer trying to cut off his shirt has cut plaintiff's left shoulder with the scissors. The camera repositions and zooms in on plaintiff's left shoulder, which appears uninjured. Nonetheless, someone off-camera requests that a medical staff member come to plaintiff's cell to examine him. An officer later remarks that plaintiff appears to have an abrasion on his left shoulder. At his deposition, plaintiff testified he sustained a "minor laceration that needed minor attention" and for which he was given "some medicated ointment" by WCJ's medical staff. (Chen Decl. Ex. 1 at 7).

Approximately thirty-five minutes into the video, while waiting for a medical staff member to arrive, officers cover plaintiff's lower body with a blanket, and plaintiff becomes more compliant. Officers continue restraining him but do so using visibly less physical force than when plaintiff actively resisted them. Plaintiff passes gas several times and laughs. An officer notes aloud that plaintiff is trying to defecate on himself.

Nearly forty minutes into the video, plaintiff is seen restrained on the bed by two officers when he says an officer has just spit on his back. The video shows one officer standing over plaintiff's back; that officer is wearing a helmet with a clear face shield covering the officer's entire face, with a small gap between the bottom of the shield and the officer's neck. No officer

is seen or heard spitting on plaintiff. Approximately twenty seconds later, plaintiff accuses the officer of spitting on him again. An officer tells plaintiff no one spit on him, to which plaintiff responds by screaming and physically twisting his body. Officers force plaintiff to lie face-down on the bed and repeatedly tell him to stop moving and stop resisting.

A medical staff member arrives around a minute later and checks plaintiff for injuries. Plaintiff says he has cuts on his ankles, which the medical staff member examines. After completing an examination, the medical staff member clears the officers to continue.

Approximately forty-five minutes into the video, an officer says, "Inmate Frost, these officers are going to remove the sheet, they are going to remove the restraints, and they are going to exit the cell. You are to follow all orders, and remain in this position unless ordered to do otherwise." (Vid. I at 45:24). Fifteen seconds later, an officer remarks that plaintiff is again attempting to defecate on himself. Plaintiff again accuses an officer of spitting on him.

An officer then begins removing plaintiff's mechanical restraints. Another officer says, "OC spray is out."[5] (Vid. I at 45:52). An unseen officer says, "Have medical standing by, just in case." (Vid. I at 46:00).

Almost forty-seven minutes into the video, all of plaintiff's mechanical restraints have been removed. Plaintiff is lying face-down on the bed in his cell. The officers begin backing out of the cell, and an officer orders plaintiff to "stay in that position. Do not move." (Vid. I at 46:50). The cell door is still open and officers are still exiting when plaintiff abruptly stands and moves toward the officers. Plaintiff testified that he was trying to leave his cell and knew he was violating the officers' orders by doing so.

---

[5] "'OC' is an abbreviation for 'oleoresin capsicum.' OC spray is also known as pepper spray or mace." United States v. Rodriguez, 392 F.3d 539, 542 n.1 (2d Cir. 2004).

As plaintiff approaches the cell door, an officer yells "Close it!" (Vid. I at 47:03). Before the door can be closed, plaintiff reaches the last officer backing out of the cell, who is holding a clear shield pointed toward plaintiff. Plaintiff pushes into the officer's shield. Officers shove plaintiff back into the cell and order him repeatedly to get on the floor. Several officers forcibly tackle plaintiff and hold him on the ground. Plaintiff testified he was still trying to exit the cell at this time.

Approximately fifteen seconds after plaintiff is tackled, an officer is heard saying "OC deployed." (Vid. I. at 47:23). Plaintiff says a few seconds later that an officer has punched plaintiff in the mouth, and then yells several times, "He's grabbing my balls!" and "He's grabbing my testicles!" (Vid. I at 47:31–Vid. II at 00:13). Plaintiff testified an officer grabbed plaintiff's testicles for "[p]ossibly a second, [or] two." (Chen Decl. Ex. 1 at 13). Defendants subdue plaintiff and place mechanical restraints on his legs and wrists. Plaintiff then says an officer kicked plaintiff in the face and mouth.

In total, defendants' use of force against plaintiff after he tries to exit his cell lasts approximately ninety seconds.

Less than a minute after defendants subdue plaintiff, the shower in plaintiff's cell is turned on, and officers walk plaintiff into the shower and instruct him to rinse the OC spray out of his eyes. Plaintiff does so. Officers then escort plaintiff to the bed in the cell, place him on the bed face-down, and cover him with a blanket. Two medical staff members arrive in the next two minutes and examine plaintiff. They again medically clear plaintiff a few minutes after they arrive.

Officers again remove plaintiff's mechanical restraints and order plaintiff to remain on the bed. Plaintiff responds, "No, I'm getting up again." (Vid. II at 6:48). An officer tells

7

plaintiff, "There's no reason to get up again." (Vid. II at 6:51). Plaintiff answers by shouting at the officer and accusing the officers in his cell of violating him.

As an officer removes plaintiff's restraints, plaintiff makes remarks including, "Y'all gonna be here all night" (Vid. II at 7:00), "Y'all gonna get this fuckin work" (Vid. II at 7:04), "I'm doing this again,"[6] and "Turn the water on or we're gonna do this again" (Vid. II at 8:09). He at one point accuses an officer of slamming plaintiff's head against the wall.

Once plaintiff's restraints have been removed, officers again back out of the cell. Plaintiff disobeys their orders by standing up while they do so. He does not walk towards the officers, who close the cell door with plaintiff inside. Plaintiff then walks next to the cell door and gives defendants the middle finger through a cell window.

Plaintiff undisputedly flooded his cell later that day, in response to which a nonparty officer assigned to the SHU turned off the water to plaintiff's cell. Plaintiff claims the water in his cell remained turned off for "close too [sic] one hundred forty-four hours." (Am. Compl. at 6).

Plaintiff claims he sustained blurred vision, a "busted lip," bruising, swelling, and lacerations during the incident. (Am. Compl. at 6). Medical records reflect that plaintiff had swelling around the eyes and an abrasion on his cheek, and that he received eye drops from WCJ's medical staff.

---

[6]  This statement is not audible on the video. However, the parties agree plaintiff made this remark. (Doc. #44 ¶ 106; Doc #51 ¶ "103–109").

**DISCUSSION**

I.      Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[7]

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."

---

7      Unless otherwise indicated, case quotations omit all citations, internal quotation marks, footnotes, and alterations.

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). This includes admissible video evidence. See, e.g., Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 481–82 (N.D.N.Y. 2017).

II. Sexual Abuse Claim

Defendants argue no reasonable juror could find any defendant violated plaintiff's constitutional rights by contacting plaintiff's anus and testicles in the manner plaintiff alleges.

The Court agrees.

To prevail on a Fourteenth Amendment claim for sexual abuse during a strip search, a pretrial detainee must show the defendant acted in a manner objectively "sufficiently severe or serious" to "constitute conduct that was sufficiently harmful enough to offend contemporary

standards of decency."[8] Gilliam v. Black, 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019).[9] Such conduct includes "a corrections officer's intentional contact with an inmate's genitalia or other intimate area," if that contact "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate" the plaintiff. Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015) (analyzing convicted inmate's Eighth Amendment claim); see, e.g., Sankara v. Plaskett, 2017 WL 4444250 (S.D.N.Y. Oct. 4, 2017) (applying this standard to pretrial detainee's Fourteenth Amendment claim). Put another way, to violate the Constitution, a jail official's sexual misconduct against a pretrial detainee violates the Fourteenth Amendment if it is "repugnant to the conscience of mankind." Crawford v. Cuomo, 796 F.3d at 258. This inquiry "is context-specific and depends upon the claim at issue." Sankara v. Plaskett, 2017 WL 4444250, at *4 (S.D.N.Y. Oct. 4, 2017).

Here, plaintiff claims a defendant contacted plaintiff's genitals on two occasions during plaintiff's transfer into the SHU. First, he alleges a defendant "swipe[d] through my anus area possibly checking for any types of contraband or something" (Chen Decl. Ex. 1 at 8)—an action plaintiff described as lasting "[a] quick second, [or] two" (id. at 9). Second, plaintiff claims a defendant grabbed plaintiff's testicles for "[p]ossibly a second, [or] two" while forcibly restraining plaintiff immediately after plaintiff tried to escape from his cell. (Id. at 13).

Assuming, for purposes of this motion, that both of these events happened as plaintiff describes, they do not amount to a constitutional violation.

---

[8] The Second Circuit has yet to resolve whether a pretrial detainee's claim of sexual abuse by a jail official is also subject to a mens rea requirement. See, e.g., Gilliam v. Black, 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019). Because plaintiff fails to satisfy the objective requirement, this question is academic in the instant case.

[9] The Court will provide pro se plaintiff copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

11

At most, defendants touched plaintiff's genitals for a total of four seconds. The first act occurred during a strip search with which plaintiff stubbornly refused to comply. The video of the incident shows that plaintiff's pants and boxers were on when this contact allegedly happened; no evidence suggests any officer touched plaintiff's buttocks for any improper purpose; and plaintiff acknowledged the officer who allegedly touched his buttocks "possibly" was searching for contraband. (Chen Decl. Ex. 1 at 8). As for the second act, it took place moments after plaintiff, while naked, tried to force his way out of his cell—an act that required several officers to respond with force by taking plaintiff to the ground, spraying him with OC spray, and restraining him until he stopped resisting. Even if a defendant grabbed plaintiff's testicles for "possibly a second, [or] two" during this scuffle, the video evidence clearly shows that defendants' conduct in response to plaintiff's provocative, threatening, and disobedient actions was eminently reasonable and professional throughout. (Id. at 13). No reasonable juror could find otherwise.

In short, even taken together, the two instances of sexual touching alleged by plaintiff fall well short of the objectively unreasonable conduct required to support a Fourteenth Amendment claim. Cf. Fox v. Lee, 2018 WL 1211111, at *25 (N.D.N.Y. Feb. 5, 2018) (collecting cases in which prisoner plaintiffs' sex abuse claim survived summary judgment).

The Court therefore grants summary judgment in defendants' favor respecting plaintiff's sexual abuse claim.

III.    Excessive Force Claim

Defendants also argue no reasonable juror could find that any defendant subjected plaintiff to excessive force.

The Court agrees.

A pre-trial detainee seeking to establish an excessive force claim under the Fourteenth Amendment must show the defendant's conduct was objectively sufficiently serious or harmful. United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999). Unlike a convicted inmate pursuing an excessive force claim under the Eighth Amendment, a pretrial detainee bringing a Fourteenth Amendment excessive force claim need not show a defendant's mens rea; rather, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).

"[T]he determination of reasonableness must be made from the perspective of a reasonable officer on the scene, including what the officer knew at the time." Granger v. Santiago, 2019 WL 1644237, at *5 (D. Conn. Apr. 16, 2019). Salient factors include (i) the need for force; (ii) the amount of force used; (iii) whether and to what extent the plaintiff was injured; (iv) the defendant's efforts, if any, "to temper or to limit the amount of force" used; (v) "the severity of the security problem at issue;" (vi) the threat, if any, the defendant reasonably perceived at the time; and (vii) "whether the plaintiff was actively resisting." Id.

Each of these factors weighs entirely in defendants' favor.

The video unmistakably shows that defendants calmly explained to plaintiff numerous times the need and reasons for strip searching him, the reasons why the strip search would be filmed, and that defendants would not forcibly remove plaintiff's clothing if plaintiff took his clothing off himself. When that failed, defendants summoned a mental health professional who again explained the situation to plaintiff and tried to answer plaintiff's questions and concerns. Only after plaintiff continued refusing to comply did defendants forcibly remove plaintiff's clothing—and defendants twice interrupted the strip search after plaintiff claimed to have been

13

injured, so medical staff could examine plaintiff, and they did not resume the strip search until a member of the medical staff cleared them to do so.

Moreover, throughout the encounter, defendants used force in proportion to plaintiff's level of resistance, lessening their use of force when plaintiff was compliant and increasing their use of force when plaintiff actively resisted them. Defendants' most severe use of force, taking plaintiff to the ground and spraying him with OC spray, took place only after plaintiff deliberately ignored defendants' orders by trying to force his way out of his cell. Even then, defendants' ensuing use of force lasted less than two minutes, after which defendants walked plaintiff to the shower in his cell so he could rinse the chemical spray out of his eyes. Defendants then once again restrained plaintiff while a medical staff member checked him for injuries. All of this conduct by defendants was objectively reasonable; the Constitution does not require anything more.

Notably, plaintiff disobeyed defendants' orders yet again while defendants left plaintiff's cell the second and final time, by rising to his feet despite defendants' repeated orders that he remain on the bed. Indeed, that is precisely what plaintiff did minutes earlier before trying to shove his way out of his cell. But instead of re-entering plaintiff's cell and using further force, defendants quickly closed the cell door—after which plaintiff walked up to defendants and gave them the middle finger through a cell window. This display of restraint by defendants further demonstrates the reasonableness of their conduct and demeanor towards plaintiff.

Moreover, to the extent plaintiff complains of defendants' use of OC spray, "the use of a single burst of a chemical agent, which is not a dangerous quantity," is a constitutionally acceptable "means of controlling an unruly or disruptive inmate." Vazquez v. Spear, 2014 WL 3887880, at *5 (S.D.N.Y. Aug. 5, 2014). Defendants used a brief burst of the spray in the

14

seconds immediately after plaintiff attempted to escape from his cell. Approximately a minute or two later, plaintiff stopped resisting, defendants stopped using force, and plaintiff then received prompt medical attention. The evidence thus shows defendants' use of the chemical spray was objectively reasonable and therefore does not give rise to a viable Fourteenth Amendment claim.

In short, as a matter of law, defendants' conduct throughout their encounter with plaintiff falls well within the Fourteenth Amendment's standard of objective reasonableness. Accordingly, the Court grants summary judgment in defendants' favor on plaintiff's excessive force claim.[10]

IV.     No Running Water in Plaintiff's Cell

Lastly, defendants argue no reasonable juror could find that any defendant was personally involved in plaintiff allegedly being kept in his cell for 144 hours without running water.

The Court agrees.

Personal involvement in an alleged constitutional violation is a prerequisite to any Section 1983 claim. See Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013). In other words, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.

No evidence suggests any defendant played any role in the alleged absence of running water in plaintiff's cell for the 144 hours after defendants' ERT unit transferred plaintiff into the

---

[10]     To the extent plaintiff asserts a Fourteenth Amendment claim because his handcuffs were "kind of tight" while he walked from the medical area to the SHU (Vid. I at 9:01), that allegation also does not state a viable constitutional claim. See, e.g., Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (collecting cases) ("[T]ight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.").

SHU. Absent any indication a defendant somehow took part in or contributed to this alleged constitutional violation, plaintiff's claim against defendants concerning the lack of running water in his cell fails as a matter of law.

The Court therefore grants summary judgment in defendants' favor on plaintiff's claim arising from the alleged lack of running water in his cell.

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk is directed to terminate the motion (Doc. #43) and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v United States, 369 U.S. 438, 444–45 (1962).

Dated: September 17, 2019
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge